**FILED**

In the United States District Court for the 9th

APR 2 1 2008

Circuit Court of the Northern District of California

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| Harry T. Lyde, GDC # 121352 | ) | Case # 08=1480 PJH (PR) |
| | ) | |
| VS | ) | **E-filing** |
| | ) | |
| George Bush, President | ) | |

Motion for Leave to File an Amended Complaint

Plaintiff, Harry T. Lyde, GDC # 1211352, comes asking the Court to

Reconsider Motion to become 3rd Party in Electronics Froniteer Foundation

Class Action Law Suit Against At. T., The Telecommunication

Communities, George Bus, President of the USA and others (Et. al.).

A

The Court has the authority under Rules 15(a), 19(a), 56(f) and 59(E),

Armstrong v Rushing 352 F.2d836, 837, (9th Cir 1965) 42 USC § 12101 Et.

Sg., 322 (1972), A Pro. Se. Claim should not be dismissed for failure to state

a claim.

B

Under Conley v Gibson 355 US 41, 45, 46 (1957) The supreme Court

said that in considering a motion to dismiss, a Pro. Se. Complaint should not

1 of 6

Case # 08-1480-PJH (PR)

be held to the same standard as Lawyers, Professional motion drafters.

### C

Petitioner do so affirm that upon receiving documents, surveillance tapes, emails and contracts, which have been previously requested by mail, by suit and now by subpoena, under most State's FOIA and Title #5 USAC, and to date, still have been refused by not answering request. (See Exhibits).

### D

Had the Bush Administration or the Telecommunication Communities given Exculpatory Evidence, my <u>Due Process Rights</u> would have been fulfilled. First Amendment to USCD Sate of Georgia, both Information Acts, drew the line at the First Amendment Right of Fair Trial. The New York Times and Atlanta Journal Constitution are sources of this report. (See Exhibits).

### E

Petitioner requested Information while on trial. Evidence is <u>Alibi</u> and witness to conversation between complaining witness.

2 of 6

Case # 08-1480-PJH (PR)

F

Petitioner further states that he had contracts with 90% of the

Telecommunication Communities which Petitioner claims added Privacy

Contracts with all except maybe 5.  Petitioner claims a 4th Amendment

Violation as well as a Right to have Evidence of the Poison Fruit suppress

my Rights of Probable Cause which is a legal justification. Show mea

Judge's signature. Show me compensation by the US Government to a

citizens I may fix blame to the abuse of my violation of contracts and rights.

First, Fourth and Eighth Amendments to the Constitution, Weeks v US

(1914), Ciraolova, California (1986), Mapps v US., The Jury could have

seen that I was not a user of the Internet for Children and Pornography.

G

That FBI Director did state that AT. T. over produced data.  No

Requested. (See exhibits).

Brief History (A)

After spending the last <u>two years</u> in the State Prison of Georgia and

having paid attorneys who abandoned Petitioner's case, after bankrupting

Petitioner and after reusing calls and letters and before stature of Limitation

expired, having Constitutional issue arise about all White Juries and proper

venue, and President Bush campaigning to protect the company that gave

of data of ones private information to government agencies without

compensation but refuses same data to customer, Petitioner case raises

constitutional question about Petitioner's Right to Fair Trial.  First, a

complaint was filed with the Supreme Court for Interloctory Ceritirer, and as

set forth in the Rule, the Supreme Court Rules designated the 9th District

Circuit as the Court of Fact Finding for this area of involvement by the

Telecommunications Communities.

## Brief History (B)

So as an innocently incarcerated inmate, who's Rights of Access to the

Court are, as we believe, all but going in Violation of the People's Right of

Habaes Corpus, the Constitution Art I Sec 9 Para # 2, the privilege of the

Writ of Habeas Corpus shall not be suspended (No matter how over worked

the Courts are) unless when in cases of rebellion or invasion, the public

safety may require it.

Para#3 No Bills of Attaindre or Ex Post Facto Law shall be passed (PLRA)

### Sec 9

These Powers are forbidden to <u>Congress</u>

### Sec 10

These powers are forbidden to States <u>Bills of Attainder, Ex Post Facto Law.</u>

In Conclusion

Wherefore, with the Defendant does make declarations of trouble getting materials and documents to fine tune claim under Rule 56 (F), the Court Stay their Order of Dismissal, or appoint Court Attorney or Grant Continuance, or have Petitioner produce Tele-Conference "medical has that Power", there are extra power the Court has for Americans with Disabilities II 1990 and any relief the Court deems Just and proper and allow Petitioner 3rd Person + Electronics Froniteer Foundation v Bush and At. T. Telecommunications Communities Class Action Law Suit.

Case # 08-1480-PJH (PR)

Respectfully submitted this 18th Day of April, 2008, Pro. Se.

Harry T. Lyde, GDC 1211352

P. O. Box 396  MSP CW44B

Hardwick, Georgia 31034

9th Circuit US Court

California USA

US District Courthouse – Clerk's Office

950 Golden Gates, 16th Floor – San Francisco, CA 94102

Electronic Frontee Foundation and

Halpton

Vs

*Exhibit A'*

ATT and Intercom Co – Class Action Law Suit

## Motion for Intervention

## Motion to Relate

Here comes Harry T. Lyde, a prisoner incarcerated in the state of Georgia

having been found guilty of a criminal charge that if I had had the

surveillance tapes that was provided by ATT and other Telecommunications

Communities (for which I made numerous request for same from private,

public and government agencies – local, state, federal, under Homeland

Security – Share Emergency Resource), was under surveillance and

information was used for political – local, state, federal - to destroy my

family, friends, "Georgia Green Party" and Plaintiff.

1 of 2

~~I have written the President and all his agencies, the Congress of the USA~~

~~and local and state agencies. To date - see: Lyde vs US DAG 11th Cir No.~~

~~District of Georgia - have received no answers and no judicial decisions.~~

Yet, Title #5 clearly states for Due Process, I must see all evidence against

me. I have lost all.

Now, I ask for my name back. I am innocent of the charges

105 years for 4 counts of child molestation, I had a 16 year Divorce, a

Retirement for which spouse must pay half of my pension.

I was Sgt U. S.R. A. NYC P. O. – 4th Vice; Elected School Board

Member; President New York City 57th AD, Georgia Green Party,

Treasurer; organized St. Simon Island 2003 June Anti- G8 Rallies; attended

New York City Republican Convention and ran for the Majority Georgia

House #156 against Jerry Keen who swore revenge.

Exhibit A'
Con't

2 of 2

## Olympics visitors warned they may be spied on

American visitors to the Olympic Games in Beijing should expect that their activities will be monitored by the Chinese government, the U.S. State Department said.

"All visitors should be aware that they have no reasonable expectation of privacy in public or private locations," stated the Bureau of Consular Affairs. "All hotel rooms and offices are considered to be subject to on-site or remote technical monitoring at all times."

The State Department said hotel rooms and offices will be subject to entry "at any time without the occupant's consent or knowledge."

The advisory, however, suggested the threat "remains low" that Americans would be targets of terrorism there. "There is no reason to believe that U.S. citizens are being targeted at this time," the advisory stated.                       — Kevin Johnson



By Alejandro Gonzalez, USA TODAY

information. ... It's an appropriate time for the media and open-government advocates to remind people and public officials of the importance of transparent government. ... The governed must have access."

**The Buffalo News,** in an editorial: "Shortly after the 9/11 terror attacks, (then-attorney general) John Ashcroft reversed policy on freedom of information requests, directing agencies to refuse them if there was a sound, legal basis to do so. ... Federal courts have gone after reporters in recent years, first during the CIA leak investigation and most recently as part of a civil lawsuit by Steven Hatfill, whom Ashcroft had identified as a person of interest in the post-9/11 anthrax scare. Former USA TODAY reporter Toni Locy is caught in the middle as Hatfill pursues a lawsuit against the federal government. ... Anyone can feel sympathy for Hatfill, but the answer to his dilemma

# Washington

## Bush urges House to OK telecom amnesty

President Bush pressed the House on Wednesday to pass new rules for monitoring terrorists' communications, saying "terrorists are planning new attacks on our country ... that will make Sept. 11 pale by comparison."

Bush said he would not agree to give the House more time to debate a measure the Senate passed Tuesday that would govern the government's ability to work with telecommunications companies to eavesdrop on phone calls and e-mails between suspected terrorists.

**Conyers:** Opposes broad amnesty.

Getty Images

The current law expires at midnight Saturday.

The bill would give phone companies retroactive protection from lawsuits filed on the basis of cooperation they gave the government without court permission — something Bush insisted on including in the bill.

"In order to be able to discover ... the enemy's plans, we need the cooperation of telecommunication companies," Bush said. "If these companies are subjected to lawsuits that could cost them billions of dollars ... they won't help protect America."

House Judiciary Committee Chairman John Conyers, D-Mich., said in letter, "There is no basis for the broad telecommunications company ... nnesty."

---

# The Intelligence Cover-Up

For more than two years now, Congress, the news media, current and former national security officials, think tanks and academic institutions have been engaged in a profound debate over how to modernize the law governing electronic spying to keep pace with technology. We keep hoping President Bush will join in.

Instead, the president offers propaganda intended to scare Americans, expand his powers, and erode civil liberties — and to ensure that no one is held to account for the illegal wiretapping he ordered after 9/11.

Consider last Thursday's performance, as the House debated a bill that closes some technology gaps in the 1978 Foreign Intelligence Surveillance Act and gives government agencies new flexibility to eavesdrop, but preserves constitutional protections against unreasonable searches. Mr. Bush distorted the contents of the bill and threatened to veto it.

He accused House leaders of "putting in place a cumbersome court approval process that would make it harder to collect intelligence on foreign terrorists." Actually, the bill merely ensures that special judges continue to supervise surveillance of American citizens. The "cumbersome process" is really a court that acts swiftly and has refused only a half-dozen of more than 21,000 wiretap requests in its nearly 30 years of existence.

What Mr. Bush wants is to be able to listen to your international telephone calls and read your international e-mail whenever he wants, without a court being able to

prevent it or judge the legality of his actions.

Mr. Bush said the House bill would "cause us to lose vital intelligence on terrorist threats." But he has never offered credible evidence of any operation that was hobbled because officials had to request a warrant. The law already allows the government to eavesdrop first and then seek a warrant. As for that technology gap, Congress fixed it last year. The authority has expired, but wiretapping operations started under it can continue.

Finally, Mr. Bush said it was vital to national security to give amnesty to any company that turned over data on Americans without a court order. The purpose of this amnesty is not to protect national secrets — that could be done during a trial — but to make sure that the full damage to Americans' civil liberties is never revealed. Mr. Bush also objects to a provision that would create a committee to examine his warrantless spying program.

Mr. Bush wanted the House to approve the Senate's version of the bill, which includes Mr. Bush's amnesty and does not do nearly as good a job of preserving Americans' rights. We were glad the House ignored his bluster. If the Senate cannot summon the courage and good sense to follow suit, there is no rush to pass a law.

The president will continue to claim the country is in grave danger over this issue, but it is not. The real danger is for Mr. Bush. A good law — like the House bill — would allow Americans to finally see the breathtaking extent of his lawless behavior.

SUNDAY, FEBRUARY 10, 2008

# Sunday Opi

*Exhibit B*

# The New York Times

**ARTHUR OCHS SULZBERGER JR.,** *Publisher*

# Because They Said So

Even by the dismal standards of what passes for a national debate on intelligence and civil liberties, last week was a really bad week.

The Senate debated a bill that would make needed updates to the Foreign Intelligence Surveillance Act — while needlessly expanding the president's ability to spy on Americans without a warrant and covering up the unlawful spying that President Bush ordered after 9/11.

The Democrat who heads the Senate Intelligence Committee, John Rockefeller of West Virginia, led the way in killing amendments that would have strengthened requirements for warrants and raised the possibility of at least some accountability for past wrongdoing. Republicans declaimed about protecting America from terrorists — as if anyone was arguing the opposite — and had little to say about protecting Americans' rights.

We saw a ray of hope when the head of the Central Intelligence Agency conceded — finally — that waterboarding was probably illegal. But his boss, the director of national intelligence, insisted it was legal when done to real bad guys. And Vice President Dick Cheney — surprise! — made it clear that President Bush would authorize waterboarding whenever he wanted.

The Catch-22 metaphor is seriously overused, but consider this: Attorney General Michael Mukasey told Congress there would be no criminal investigation into waterboarding. He said the Justice Department decided waterboarding was legal (remember the torture memo?) and told the C.I.A. that.

So, according to Mukaseyan logic, the Justice Department cannot investigate those who may have committed torture, because the Justice Department said it was O.K. and Justice cannot be expected to investigate itself.

As it was with torture, so it was with wiretaps.

After the 2001 terrorist attacks, the president decided to ignore the Foreign Intelligence Surveillance Act, or FISA, and authorized wiretaps without a warrant on electronic communications between people in the United States and people abroad. Administration lawyers ginned up a legal justification and then asked communications companies for vast amounts of data.

According to Mr. Rockefeller, the companies were "sent letters, all of which stated that the relevant activities had been authorized by the president" and that the attorney general — then John Ashcroft — decided the activity was lawful. The legal justification remains secret, but we suspect it was based on the finely developed the-

allowed warrantless eavesdropping for up to a year if the president certified that it was directed at a foreign power, or the agent of a foreign power, and there was no real chance that communications involving United States citizens or residents would be caught up. As we now know, the surveillance included Americans and there was no "foreign power" involved.

The law then, and now, also requires the attorney general to certify "in writing under oath" that the surveillance is legal under FISA, not some fanciful theory of executive power. He is required to inform Congress 30 days in advance, and then periodically report to the House and Senate intelligence panels.

Congress was certainly not informed, and if Mr. Ashcroft or later Alberto Gonzales certified anything under oath, it's a mystery to whom and when. The eavesdropping went on for four years and would probably still be going on if The Times had not revealed it.

So what were the telecommunications companies told? Since the administration is not going to investigate this either, civil actions are the only alternative.

The telecoms, which are facing about 40 pending lawsuits, believe they are protected by a separate law that says companies that give communications data to the government cannot be sued for doing so if they were obeying a warrant — or a certification from the attorney general that a warrant was not needed — and all federal statutes were being obeyed.

To defend themselves, the companies must be able to show they cooperated and produce that certification. But the White House does not want the public to see the documents, since it seems clear that the legal requirements were not met. It is invoking the state secrets privilege — saying that as a matter of national security, it will not confirm that any company cooperated with the wiretapping or permit the documents to be disclosed in court.

So Mr. Rockefeller and other senators want to give the companies immunity even if the administration never admits they were involved. This is short-circuiting the legal system. If it is approved, we will then have to hope that the next president will be willing to reveal the truth.

Mr. Rockefeller argues that companies might balk at future warrantless spying programs. Imagine that!

This whole nightmare was started by Mr. Bush's decision to spy without warrants — not because they are hard to get, but because he decided he was above the law. Discouraging that would be a service to the nation.

This debate is not about whether the United States

*Exhibit C*

# Error Gave F.B.I. Unauthorized Access to E-Mail

## As Wiretaps Grow, Mistakes Receive Little Notice

### By ERIC LICHTBLAU

WASHINGTON — A technical glitch gave the F.B.I. access to the e-mail messages from an entire computer network — perhaps hundreds of accounts or more — instead of simply the lone e-mail address that was approved by a secret intelligence court as part of a national security investigation, according to an internal report of the 2006 episode.

F.B.I. officials blamed an "apparent miscommunication" with the unnamed Internet provider, which mistakenly turned over all the e-mail from a small e-mail domain for which it served as host. The records were ultimately destroyed, officials said.

Bureau officials noticed a "surge" in the e-mail activity they were monitoring and realized that the provider had mistakenly set its filtering equipment to trap far more data than a judge had actually authorized.

The episode is an unusual example of what has become a regular but little-noticed occurrence,

or years by the Federal Bureau of Investigation, many of them considered technical and inadvertent.

Bureau officials said they did not have updated public figures but were preparing them as part of a wider-ranging review by the inspector general into misuses of the bureau's authority to use socalled national security letters in gathering phone records and financial documents in intelligence investigations.

In the warrantless wiretapping program approved by President

Continued on Page 15

panded their technological tools: government officials, or the private companies they rely on for surveillance operations, sometimes foul up their instructions about what they can and cannot collect.

The problem has received no discussion as part of the fierce debate in Congress about whether to expand the government's wiretapping authorities and give legal immunity to private telecommunications companies that have helped in those operations.

But an intelligence official, who spoke on condition of anonymity because surveillance operations are classified, said: "It's inevitable that these things will happen. It's not weekly, but it's common."

A report in 2006 by the Justice Department inspector general found more than 100 violations of [...] wiretapping law in the two trimesters [...]

the 2,025 delegates needed to claim the nomination before the end of the voting season, so they will need the support of superdelegates to get over the top.

The delegates are under no obligation to vote as they say they will. Already, they are showing a willingness to change their minds, as Mrs. Clinton was reminded when Representative John Lewis of Georgia switched course and said he would vote for

Continued on Page 20

## Counting Heads

How Democrats and Republicans award delegates says a lot about their philosophical differences. Week in Review.

# A Smiling, Fidgeting McCain, Learning to Rein Himself In

### By MARK LEIBOVICH

WASHINGTON — So this is what it looks like when the maverick becomes The Man.

Senator John McCain was sitting in the front of his campaign pants front-runner's plane, [...]

[...] song blares over a loudspeaker at some McCain rallies) — given relatively cautious answers, if trying to rein in his pugnacity, if not his wisecracks.

On a flight from Pennsylvania [...]

# F.B.I. Got Unauthorized Access to E-Mail

Exhibit C

*From Page 1*

Bush after the Sept. 11 terrorist attacks, technical errors led officials at the National Security Agency on some occasions to monitor communications entirely within the United States — in apparent violation of the program's protocols — because communications problems made it difficult to tell initially whether the targets were in the country or not.

Past violations by the government have also included continuing a wiretap for days or weeks beyond what was authorized by a court, or seeking records beyond what were authorized. The 2006 case appears to be a particularly egregious example of what intelligence officials refer to as "overproduction" — in which a telecommunications provider gives the government more data than it was ordered to provide.

The episode was disclosed as part of a new batch of internal documents that the F.B.I. turned over to the Electronic Frontier Foundation, a nonprofit group in San Francisco that advocates for greater digital privacy protections, as part of a Freedom of Information Act lawsuit the group has brought. The group provided the documents on the 2006 episode to The New York Times.

Marcia Hofmann, a lawyer for the privacy foundation, said the episode raised troubling questions about the technical and policy controls that the F.B.I. had in place to guard against civil liberties abuses.

"How do we know what the F.B.I. does with all these documents when problem like this comes up?" Ms. Hofmann asked.

In the cyber era, the incident is the equivalent of law enforcement officials getting a subpoena to search a single apartment, but instead having the landlord give them the keys to every apartment in the building. In February 2006, an F.B.I. technical unit noticed "a surge in data being collected" as part of a national secu-

---

*An Internet provider turned over more information than authorized.*

---

rity investigation, according to an internal bureau report. An Internet provider was supposed to be providing access to the e-mail of a single target of that investigation, but the F.B.I. soon realized that the filtering controls used by the company "were improperly set and appeared to be collecting data on the entire e-mail domain" used by the individual, according to the report.

The bureau had first gotten authorization from the Foreign Intelligence Surveillance Court to monitor the e-mail of the individual target 10 months earlier, in April 2005, according to the internal F.B.I. document. But Michael Kortan, an F.B.I. spokesman, said in an interview that the

problem with the unfiltered e-mail went on for just a few days before it was discovered and fixed. "It was unintentional on their part," he said.

Mr. Kortan would not disclose the name of the Internet provider or the network domain because the national security investigation, which is classified, is continuing. The improperly collected e-mail was first segregated from the court-authorized data and later was destroyed through unspecified means. The individuals whose e-mail was collected apparently were never informed of the problem. Mr. Kortan said he could not say how much e-mail was mistakenly collected as a result of the error, but he said the volume "was enough to get our attention." Peter Eckersley, a staff technologist for the Electronic Frontier Foundation who reviewed the documents, said it would most likely have taken hundreds or perhaps thousands of extra messages to produce the type of "surge" described in the F.B.I.'s internal reports.

Mr. Kortan said that once the problem was detected the foreign intelligence court was notified, along with the Intelligence Oversight Board, which receives reports of possible wiretapping violations.

"This was a technical glitch in an area of evolving tools and technology and fast-paced investigations," Mr. Kortan said. "We moved quickly to resolve it and stop it. The system worked exactly the way it's designed."

Please make copy's

Exhibit D

Blue Ridge, GA. 3

5513

## LETTERS TO THE EDITOR

## OPINIONS

Tuesday, April 1, 2008 · A

Observer

# triot Act reflects dangerous historical parall

**ews Observer,**

d a breakdown of the ct" in "the Constitu-ile," a book by Judge Napolitano. Anyone ws him and knows are that we are both the conservative side s. This book tells you parties have misused ature and the courts to Constitution to give ral government more nd you and me less.

ourself, as I had to ask exactly what is the Act? Oh I know it is a was passed to help the nent catch terrorists, at is it exactly? What willing to give up so ernment can have this I know that I had no nat we gave up.

ess I wasn't concerned e I wasn't a terrorist. I would be beneficial for you reading this, to get ok, but here is a simple lown on the act.

a little history: back t we were colonies, the of England needed to some revenue, so the ment passed the "Stamp

Act." All official papers in the colonies had to have a stamp, and the taxes paid. Official papers included everything, even posters put up on poles to advertise something.

To enforce this they also passed the "Writs of Assistance Act," which allowed British troops to write their own war-rants to enter your home, and they could look for anything they wanted, including things not associated with the stamp taxes. You could be imprisoned with no representation.

We went to war over this and other problems with England, so as to assure our freedoms as individuals. We won. We also wrote a Constitution, with the Bill of Rights, to protect ourselves from these kinds of actions from our own govern-ment. After all, our ancestors came to America for freedom.

The Fourth Amendment in the Bill of Rights protects us from search and seizure with-out a search warrant, signed by a judge, which is supposed to be a neutral party, who stands between you and the govern-ment.

In 1977, under President

Jimmy Carter, Congress en-acted the "Foreign Intelligence Surveillance Act" (FISA), which formed a secret court that could issue warrants to the government, and only government to investigate foreign agents. They had to show probable cause that the person being investigated was an agent. Sounds OK so far. I'm not a foreign agent.

Then, in 1978, Congress upped the ante by passing the "Right to Financial Privacy Act." This allowed any fed-eral agent to write his own search warrant to look into the finances of any foreign agent (no warrant from a judge). This was the first time in American history this was allowed. Hey, again, I'm not an agent.

During Ronald Reagan's presidency, in 1986, Congress enacted the "Electronic Com-munications Privacy Act of 1986." This act changed for-eign agent to foreign person. The person only had to be foreign – not from the United States. I'm American. So far, so good. It's all about foreign-ers and our security.

Then 9/11 happened and within 30 days of the attack, President Bush pushed through the "Patriot Act." The Patriot Act allows federal and local police to write their own search warrants and use any informa-tion they gather in a criminal prosecution, previously not allowed, as long as they are operating under the umbrella of the Patriot Act.

If the recipient of this war-rant were to go to the news media or to a lawyer to make it known publicly, he could receive five years in prison under the provisions of the Patriot Act.

Included in this act is a pro-vision called "sneak and peek," which allows the government to enter your house while you are away and take anything they feel is necessary for their investigation. While you are assuming that you have been robbed, the government can hold back information for six months before admitting they invaded your house. All this is proof, if they have written their own search warrant. You no longer have to be foreign to have this happen.

In 2003, President Bush signed the "Intelligence Auth-rization Act for 2004," which allows them to get record from any financial institutio OK not that bad, but wa they define a financial insti tion as: a bank, credit uni a stock broker, an investm banker, an insurance compa a pawn broker, an accountan hospital, an HMO, a compu service, a telephone compa a physician, a pharmacist deli catessen, a travel age an automotive agency, a b dealer, a real estate broke lawyer, and the post office

So, with the Patriot Act, government has the righ sneak into your house wit telling you take anything y want, bug your phone, l at any of your records, m cal or financial, and take away, with no repercussi Are we comfortable givin government the key to al privacy? Are we comfor with the ability they now h to spy on us?

There is far more, but t enough to scare all of us

I understand that we need to catch terrorists but I am con-cerned that our government is taking a big chunk of our free dom by playing on our fear Will the world ever be hall rid of terrorists? I doubt it Sc how long does this Patriot A last? I can't see them just say ing, "That's enough," letting the restrictions back in place. Kind of like those taxes to l narrate the Second World Wa they never went away.

Looking back in histor again, remember, Hittler wa voted into office and the same man people let him take t their freedom away.

He played on their think and made them think it wa necessary. Are we living i tory over?

**Steve Halt**
Cherry, l

Send Your Letters
letters@
The News Observe
thenewsobserver.con



Exhibit E

14A · MONDAY, MARCH 24, 2008 · USA TODAY

USA TODAY hopes to serve as a forum for better understanding and unity to help make the USA truly one nation.
—Allen H. Neuharth, Founder, Sept. 15, 1982
President and Publisher: Craig A. Moon

Today's debate: Accountability

# Another terrorist watch list claims innocent victims

**Our view:**
Treasury Dept. lets damage linger despite obvious mistakes.

## We're fixing list problems

**Opposing view:**
Treasury is acting to improve screening, avert false matches.

By Adam J. Szubin

By Carolyn Pesce with wire reports

| About two-thirds of the cases | this year's level.

there wasn't a major fu ...\    ved in deliver-   your country."

# ✳ Surveillance law in limbo as House takes week-long recess

By Ken Dilanian
USA TODAY

WASHINGTON — Democratic leaders allowed House members to leave town for a week-long recess Thursday without ending a dispute over a temporary electronic surveillance law that expires Saturday.

President Bush warned that inaction "could reopen dangerous gaps in our intelligence," while House Speaker Nancy Pelosi accused Bush of "fear mongering."

"The president has all the authority he needs to protect the American people," Pelosi said.

At issue is the 1978 law that allows the government to monitor the telephone conversations of suspected foreign terrorists without warrants.

There is general agreement on how to modernize the law, but House Democratic leaders oppose one provision that would dismiss about 40 lawsuits against telecommunications companies accused of helping the government conduct improper wiretapping after the 9/11 terrorist attacks.

Arguing that phone companies operated in good faith, Bush and a majority of senators support that provision.

Last August, Congress passed a temporary surveillance law that ex-



By Mark Wilson, Getty Images

**House Republicans protest:** Minority Leader John Boehner leads fellow party members in walk-out Thursday after Democrats voted to censure two former White House aides but let wiretapping bill expire.

pires at midnight Saturday, with the idea of using the time to craft a permanent fix. Many Democrats opposed the temporary law. The American Civil Liberties Union ran Internet ads depicting Pelosi and Senate Majority Leader Harry Reid as sheep who say "Bush wanted more power to eavesdrop on ordinary Americans, and we just followed along."

On Tuesday, the Senate passed its version of a permanent surveillance law that includes immunity for

Telecommunication companies. On Wednesday, House leaders sought to pass a 21-day extension to the temporary law, to allow more time to negotiate. Bush vowed to veto such an extension, and Republicans, with the help of some Democrats, defeated it.

House Republicans walked off the floor Thursday to protest the fact that Democrats refused to act on the Senate's surveillance bill but went forward in approving contempt citations for White House

chief of staff Josh Bolten and former Bush counsel Harriet Miers in connection with their participation in the firing of federal prosecutors.

"The majority says we've got space on the floor of the House to do some political stunt, but we don't have space to do what's in our nation's best interest, and that's to protect the American people," said Minority Leader John Boehner, R-Ohio.

Arguing that a lapse in the law would not impair intelligence gathering, Pelosi cited the comments of Kenneth Wainstein, assistant attorney general for national security, who said in August that if the law

## Repercussions in letting bill lapse

**At issue:** The Protect America Act is a temporary surveillance law passed by Congress in August that is due to expire at midnight Saturday. President Bush wants Congress to pass a bill that would amend the Foreign Intelligence Surveillance Act (FISA), the permanent surveillance law, before the Protect America Act expires.

**Question:** What happens if the Protect America Act expires without a new FISA law in place?

**President Bush says:** "Failure to act would harm our ability to monitor new terrorist activities, and could reopen dangerous gaps in our intelligence. Failure to act would also make the private sector less willing to help us protect the country, and this is unacceptable."

**The facts:** Expiration of the Protect America Act would not mean an immediate end to wiretapping. Existing

surveillance could continue under the law for a year from when it began — at least until August. Any new surveillance the government wants to institute could be implemented under existing FISA rules, which may require warrants from the secret FISA court. One of the provisions of the new FISA law would shield from lawsuits telecommunications companies that helped the government eavesdrop on their customers without court permission after the Sept. 11, 2001, terrorist attacks. That provision is not in the current FISA law. Without it, Bush says, private companies would be less willing to help with government surveillance.

Sources: The White House, the Associated Press and USA TODAY research

expired, "intelligence officials would still be able to continue surveillance on already approved targets" through August.

Pelosi said any new surveillance could be implemented under the rules set out by the 1978 Foreign Intelligence Surveillance Act (FISA), which created a secret court to approve eavesdropping warrants.

White House spokeswoman Dana Perino said that if the temporary Protect America Act expires before FISA is amended, officials will be barred from authorizing surveillance against newly discovered international terrorist groups abroad. Bush also complained that, with-

out the immunity provision, telephone companies would be less likely to cooperate with the government.

Democrats erupted at the suggestion they were soft on security. Bush's comments "might make some (Democrats) squirm," Rep. Jerrold Nadler, D-N.Y., said in an interview, "but I think enough of the people in the country know that the lies all the time, anyway."

House Majority Leader Steny Hoyer, D-Md., said Wednesday that the Bush administration wants to stop the lawsuits because "they are so nervous about what might be disclosed."

*Exhibit F*

FEB. 15, 2008

# York Times

DECEMBER 30, 2007

*Exhibit G*



JOSHUA LOTT FOR THE NEW YORK TIMES

pport along State Highway 92.



YANA PASKOVA FOR THE NEW YORK TIMES

rter displaying her handiwork.

## f Iowa Voters

it," Gov. Chet Culver, a Democrat who has not endorsed anyone in the race, said in an interview in his office on Friday. "The get-out-the-vote efforts are going to be the best ever."

On the Republican side, Mitt Romney is also making an intense effort to turn out his supporters to stave off Mike Huckabee, the former Arkansas governor who polls suggest has made a late surge that gives him a chance of victory. Mr. Romney, a

## Tapes by C.I.A. Lived and Died To Save Image

### Agency Feared Effects on Public Perception

**By SCOTT SHANE and MARK MAZZETTI**

WASHINGTON — If Abu Zubaydah, a senior operative of Al Qaeda, died in American hands, Central Intelligence Agency officers pursuing the terrorist group knew that much of the world would believe they had killed him.

So in the spring of 2002, even as the intelligence officers flew in a surgeon from Johns Hopkins Hospital to treat Abu Zubaydah, who had been shot three times during his capture in Pakistan, they set up video cameras to record his every moment: asleep in his cell, having his bandages changed, being questioned by interrogators.

In fact, current and former intelligence officials say, the agency's every action in the prolonged drama of the interrogation videotapes was prompted in part by worry about how its conduct might be perceived — by Congress, by prosecutors, by the American public and by Muslims worldwide.

This worry drove the decision to begin taping interrogations — and to stop taping just months later, after the treatment of prisoners had escalated to include waterboarding. And it fueled the nearly three-year campaign by the agency's clandestine service for permission to destroy the tapes, culminating in a November 2005 destruction order from the director of the service, Jose A. Rodriguez Jr.

The Justice Department, the C.I.A.'s inspector general and Congress are all conducting investigations to determine whether any official lied about the tapes or broke the law by destroying them. Still in dispute is whether any White House official encouraged the destruction of the tapes and whether the C.I.A. deliberately hid the tapes from the na-



## wants immunity before testifying

### Judge refuses to probe destruction of tapes

**By MATT APUZZO**
Associated Press

**WASHINGTON** – Attorneys for Jose Rodriguez told Congress the former CIA official won't testify about the destruction of CIA videotapes without a promise of immunity, two people close to the tapes inquiry said Wednesday.

Rodriguez, the former head of the CIA's National Clandestine Service, ordered that the tapes, which show harsh CIA interrogation of two al-Qaida suspects, be destroyed in 2005. Rodriguez is scheduled to testify before the House Intelligence Committee on Jan. 16.

Defense attorney Robert Bennett told lawmakers, however, that he would not let Rodriguez testify because of the criminal investigation into the case. Without a promise of immunity, anything Rodriguez said at the hearing could be used against him in court.

The discussions were described to The Associated Press by two people close to the case who spoke on condition of anonymity because the talks were to be private.

---

## Scout Movement

**MOTTO**
Be prepared

**SLOGAN**

Please see **OVERTIME, 4A**

The other four deputies — the command staff of the Corrections Division — were punished for allowing Barkley to violate jail policy and procedure and failing to give clear directions to

Exhibit

*Exhibit I*

terrogators in training to watch the tapes."

Given such advantages, why was the taping stopped by the end of 2002, less than a year after it started?

"By that time," Mr. Krongard said, "paranoia was setting in."

### The Decision to Tape

By several accounts, the decision to begin taping Abu Zubaydah and another detainee suspected of being a Qaeda operative, Abd al-Rahim al-Nashiri, using individual video cameras was made in the field, with several goals in mind.

First, there was Abu Zubaydah's precarious condition. "There was concern that we needed to have this all documented in case he should expire from his injuries," recalled one former intelligence official.

Just as important was the fact that for many years the C.I.A. had rarely conducted even standard interrogations, let alone ones involving physical pressure, so officials wanted to track closely the use of legally fraught interrogation methods. And there was thought to be captured all the information to be gleaned from a rare resource — direct testimony from those who had attacked America.

But just months later, the taping was stopped. Some field officers had never liked the idea. "If you're a case officer, the last thing you want is someone in Washington second-guessing everything you did," said one former agency veteran.

More significant, interrogations of Abu Zubaydah had gotten rougher, with

because the agency's top lawyer, Scott W. Muller, advised against it, current and former officials said.

Yet agency officials decided to float the idea of eliminating the tapes on Capitol Hill, hoping for political cover. In February 2003, Mr. Muller told members of the House and Senate oversight committees about the C.I.A.'s interest in destroying the tapes for security reasons.

But both Porter J. Goss, then a Republican congressman from Florida and the chairman of the House Intelligence Committee, and the ranking Democrat, Representative Jane Harman of California, thought destroying the tapes would

greater rivals.

to the operations people that they were protected on a lot of other programs, too."

Mr. Helgerson completed his investigation of interrogations in April 2004, according to one person briefed on the still-secret report, which concluded that some of the C.I.A.'s techniques appeared to constitute cruel, inhuman and degrading treatment under the international Convention Against Torture. Current and former officials said the report did not explicitly state that the methods were torture.

A month later, as the administration reeled from the Abu Ghraib revelations,

expected to run operations without clearing every decision with superiors.

During a meeting in Mr. Goss's office with Mr. Rodriguez, John A. Rizzo, who by then had replaced Mr. Muller as the agency's top lawyer, told the new C.I.A. director that the clandestine branch wanted a firm decision about what to do with the tapes.

According to two people close to Mr. Goss, he advised against destroying the tapes, as he had in Congress, and told Mr. Rizzo and Mr. Rodriguez that he thought the tapes should be preserved at the overseas location. Apparently he did not explicitly prohibit the tapes' de-

mer officials, lawyers in written guidance that he thority to destroy the ta such a move would not be

One day in November driguez sent a cable ord struction of the recordi terward, he notified both Mr. Rizzo, taking full res the decision.

Former intelligence offi Mr. Goss was unhappy at in part because it was fur that as the C.I.A. direct weakened that his subor directly reject his advice. that Mr. Rodriguez was manded. Nor is there evid Goss promptly notified the tapes were gone.

The investigations ov frustrate some C.I.A. vet they believe that the agen fairly blamed for policies terrogation approved at Bush administration and gressional leaders. Intelli are divided over the use ods as waterboarding. methods helped get inf prevented terrorist attacl John C. Gannon, a forme director, say it was a trap the administration to methods as waterboardin said he thought the tape an issue because they w tled the legal debate o methods.

"To a spectator it woul ture," he said. "And tortu



John A. Rizzo, left, during hearings in June before he was confirmed as the C.I.A.'s top lawyer. Porter J. Goss, right, the C.I.A.'s director from 2004 to 2006, is said to have opposed the destruction of the agency's interrogation tapes.

STEPHEN CROWLEY/THE NEW YORK TIMES    ANDREW COUNCILL FOR THE NEW YORK TIMES

# CELEBRATE THE
# NEW YEAR WITH ...

JEFF KOONS, JOSH BROLIN, MARK MORRIS, WYNTON MARSALIS
THE NAKED BROTHERS BAND, PAUL AUSTER, FEIST, BROADWAY'S
MARY POPPINS, JAMES LEVINE, MEL BROOKS ... AND MANY MORE

ArtsandLeisureWeek.com

The New York Times
## ARTS & LEISURE WEEK JANUARY 7-2008

The New York Times
# ARTS & LEISURE WEEK JANUARY 7–13, 2008
ArtsandLeisureWeek.com

Exhibit 5

FEATURED COLUMNISTS  MONDAY: Bill Shipp  TUESDAY: Charles Richardson  THURSDAY: Phil



Opinions of The Telegraph Editorial Board

# President should consider
# following law on wiretaps

The war of words between congressional Democrats and President Bush over how and under what circumstances the government will be permitted to eavesdrop on telephone calls and e-mails inside the United States is lodged on an uneasy precipice. The House, pushing ahead following a rarely-held secret session last Thursday, voted along party lines to establish limits as to what would be permitted in wiretapping communications alleged to be between persons suspected of terrorist activities. The measure offers no protection or retroactive immunity for telecommunication companies facing up to 40 lawsuits from persons who allege those companies permitted the government to illegally eavesdrop on them. Mr. Bush vows to veto this or any other measure that does not contain the immunity guarantees, leaving the matter unresolved as Congress takes a two-week vacation.

President Bush contends that because Congress refuses to grant U.S. communications companies immunity, they won't agree to further warrantless eavesdropping for fear of prosecution. This, he says, leaves the country unable to defend against certain terrorist activities. The surveillance law, the Associated Press notes, is "intended to help the government pursue suspected terrorists by making it easier to eavesdrop on international phone calls and e-mails between foreigners abroad and Americans in the U.S." while removing "barriers to collecting purely foreign communications that pass through the United States."

In recent days the president has repeatedly accused congressional Democrats of sabotaging the government's ability to combat terrorism by withholding the immunity provision. He neglected to say, however, that the government can wiretap suspicious communications but it first must obtain a warrant through a secret court established by the Foreign Intelligence Surveillance Act (FISA). The lawsuits the telecoms face are in response to wiretaps placed after 9/11 without legal authority, which the White House arbitrarily decreed legal.

While the president and probably would veto the House measure should it ever get to his desk, that still leaves him unable to proceed with an eavesdropping program since the telecoms aren't going to cooperate. This leads us to ask: what should the next step be? It would be prudent at this point to determine whether or not the lawsuits are valid, something a federal judge could determine. Then the president might consider doing something he has steadfastly ignored in the past as wiretaps are concerned: He could follow the law rather than pick and choose which parts of the law apply to him.

That's the reason he's got into this problem in the first place.

—*Phil Dodson/for the Editorial Board*

Exhibit K

# Ex-CIA official wants immunity before testifying

## Judge refuses to probe destruction of tapes

By MATT APUZZO
Associated Press

WASHINGTON — Attorneys for Jose Rodriguez told Congress the former CIA official won't testify about the destruction of CIA videotapes without a promise of immunity, two people close to the tapes inquiry said Wednesday.

Rodriguez, the former head of the CIA's National Clandestine Service, ordered that the tapes, which show harsh CIA interrogation of two al-Qaida suspects, be destroyed in 2005. Rodriguez is scheduled to testify before the House Intelligence Committee on Jan. 16.

Defense attorney Robert Bennett told lawmakers, however, that he would not let Rodriguez testify because of the criminal investigation into the case. Without a promise of immunity, anything Rodriguez said at the hearing could be used against him in court.

The discussions were described to The Associated Press by two people close to the case who spoke on condition of anonymity because the talks were to be private.

The CIA has acknowledged that it destroyed the videos, and the Bush administration has urged Congress and the courts to stay out of the tapes inquiry while the Justice Department investigates.

U.S. District Judge Henry H. Kennedy agreed Wednesday not to hold hearings. He said the Justice Department had promised a thorough investigation, and he saw "no reason to disregard the Department of Justice's assurances."

Congress, however, has refused to back off and had planned to make Rodriguez one of the first witnesses in its investigation. It was unclear whether Bennett issued a formal request for immunity or merely told the committee that Rodriguez wouldn't testify without it.

Reached by telephone Wednesday night, Bennett said he would have no public comment on the matter. A spokesman for the committee also declined to comment.

Lawmakers are typically reluctant to grant immunity requests because doing so could torpedo a criminal investigation. Anything Rodriguez spoke about would be off-limits to the Justice Depart-

Exhibit C

THE NEW YORK TIMES **INTERNATIONAL** SUNDAY, DECEMBER 30, 2007




A operatives
ect **Abu**
**aydah** (top) and
ther terrorism
pect, **Abd al-**
**im al-Nashiri**, to
are interrogation
videotape the
sions.

**FEB. 2003**
**Scott W. Muller**, the top lawyer at the C.I.A.,
briefs the leaders of the House and Senate
intelligence committees, informing them for
the first time about the
interrogation tapes. He
says the agency was
considering destroying the
tapes; committee leaders
advise against it.



**JUNE 2003-JAN. 2004**
The Sept. 11
Commission repeatedly
requests information on
interrogations from the
C.I.A. The C.I.A. fails
to disclose the existence
of the tapes or to turn
them over.

**MAY 2004**
Mr. Muller discusses the
tapes with White House
lawyers. What the
lawyers tell him is in
dispute, but they do not
explicitly prohibit the
destruction of the tapes.

**NOV. 2005**
Jose A. Rodriguez Jr., chief of C.I.A.'s
clandestine service, orders the
destruction of the videotapes after being
advised by agency lawyers that it will not
be illegal and is within his authority. He
then informs Porter J. Goss, then the
C.I.A. director, or the agency's top lawyer,
John A. Rizzo, that the tapes are gone.

'03          '04          '05          '06          '07

**NOV. 2002**
Afghan prisoner
freezes to death in
C.I.A. custody.

**DEC. 2002**
Two prisoners die in
United States military
custody in Afghanistan.

**END OF 2002**
C.I.A. halts the
video-taping of
interrogations.

**2003-APRIL 2004**
C.I.A. inspector general
investigates the
agency's detention and
interrogation program.

**APRIL 2004**
Photographs of
abuse at Abu Ghraib
prison in Iraq are
made public and set
off a furor about
prisoner treatment.

**NOV. 2005**
As Congress debates the Detainee
Treatment Act, which outlaws cruel,
inhuman and degrading treatment of
detainees, the C.I.A. rushes to move
Al Qaeda prisoners after The
Washington Post reports they are
being held in Eastern Europe.

# by C.I.A. Lived and Died in Effort to Safeguard Agency's Image

m Page 1

f abuse at Abu Ghraib
l reminded the admin-
ower of such images.
hed over the tenure of
and became entangled
a the agency's top law-
ctor general.

mented a program so
that President Bush
ed with intelligence of-
it he not be told the lo-
ret C.I.A. prisons. Now,
the tapes and their de-
have become just the
the agency sought to
ady fierce controversy
e Bush administration
re has been added the
r-up.

n no political or securi-
s, videotaping every in-
preserving the tapes
nent sense, according
ence officials.

have more than one or
the room," said A.B.
C.I.A.'s No. 3 official at
rrogations were taped.
le with spectacular lan-
watch the tapes. You
Al Qaeda experts to
es. You want psychol-
the tapes. You want in-
training to watch the

dvantages, why was the
by the end of 2002, less
r it started?
e," Mr. Krongard said,
etting in."

**a to Tape**

.each new tactic approved by cable from
headquarters. American officials have
said that Abu Zubaydah was the first
Qaeda prisoner to be waterboarded, a
procedure during which water is poured
over the prisoner's mouth and nose to
create a feeling of drowning. Officials
felt they could not risk a public leak of
film showing Americans giving such
harsh treatment to bound prisoners.

Heightening the worries about the
tapes was word of the first deaths of
prisoners in American custody. In No-
vember 2002, an Afghan man froze to
death overnight while chained in a cell
at a C.I.A. site in Afghanistan, north of
Kabul, the capital. Two more prisoners
died in December 2002 in American mil-
itary custody at Bagram Air Base in Af-
ghanistan.

By late 2002, interrogators were recy-
cling videotapes, preserving only two
days of tapes before recording over
them, one C.I.A. officer said. Finally,
senior agency officials decided that
written summaries of prisoners' an-
swers would suffice.

Still, that decision left hundreds of
hours of videotape of the two Qaeda fig-
ures locked in an overseas safe.

Clandestine service officers who had
overseen the interrogations began
pushing hard to destroy the tapes. But
George J. Tenet, then the director of
central intelligence, was wary, in part
because the agency's top lawyer, Scott
W. Muller, advised against it, current
and former officials said.

Yet agency officials decided to float
the idea of eliminating the tapes on Cap-
itol Hill, hoping for political cover. In
February 2003, Mr. Muller told mem-
bers of the House and Senate intelligence
committees about the C.I.A's interest in

be legally and politically risky. C.I.A. of-
ficials did not press the matter.

## The Detention Program

Scrutiny of the C.I.A.'s secret deten-
tion program kept building. Later in
2003, the agency's inspector general,
John L. Helgerson, began investigating
the program, and some insiders be-
lieved the inquiry might end with crimi-
nal charges for abusive interrogations.

Mr. Helgerson — now conducting the
videotapes review with the Justice De-
partment — had already ranked covert
officers with an investigation into the
2001 shooting down of a missionary
plane by Peruvian military officers ad-
vised by the C.I.A. The investigation set
off widespread concern within the clan-
destine branch that a day of reckoning
could be coming for officers involved in
the agency's secret prison program.
The Peru investigation often pitted Mr.
Helgerson against Mr. Muller, who vig-
orously defended members of the clan-
destine branch and even lobbied the
Justice Department to head off criminal
charges in the matter, according to for-
mer intelligence officials

"Muller wanted to show the clandes-
tine branch that he was looking out for
them," said John Radsan, who served
as an assistant general counsel for the
C.I.A. from 2004 to 2004. "And his ag-
gressiveness on Peru was meant to
prove to the operations people that they
were protected on a lot of other pro-
grams, too."

Mr. Radsan completed his investi-
gation of interrogations in April 2004,
according to one person briefed on the
still-secret report, which concluded that
some of the C.I.A.'s techniques ap-
peared to constitute cruel, inhuman and

Mr. Muller, the agency general counsel,
met to discuss the report with three sen-
ior lawyers at the White House: Alberto
R. Gonzales, the White House counsel;
David S. Addington, legal adviser for
Vice President Dick Cheney; and John
B. Bellinger III, the top lawyer at the
National Security Council.

The interrogation tapes were dis-
cussed at the meeting, and one Bush ad-
ministration official said that, according
to notes of the discussion, Mr. Bellinger
advised the C.I.A. against destroying
the tapes. The positions Mr. Gonzales
and Mr. Addington took are unknown.
One person familiar with the discussion
said that in light of concerns raised in
the inspector general's report that
agency officers could be legally liable
for harsh interrogations, there was a
view at the time among administration
lawyers that the tapes should be pre-
served.

## Looking for Guidance

After Mr. Tenet and Mr. Muller left
the C.I.A. in mid-2004, Mr. Rodriguez
and other officials from the clandestine
branch decided again to take up the
tapes with the new chief at Langley, Mr.
Goss, the former congressman.

Mr. Rodriguez had taken over the
clandestine directorate in late 2004, and
colleagues say Mr. Goss repeatedly em-
phasized to Mr. Rodriguez that he was
expected to run operations without
clearing every decision with superiors.

During a meeting in Mr. Goss's office
with Mr. Rodriguez, John A. Rizzo, who
by then had replaced Mr. Muller as the
C.I.A. director that the clandestine branch
wanted a firm decision about what to do
with the tapes.

struction.

Yet in November 2005, Congress al-
ready was moving to outlaw "cruel, in-
human and degrading" treatment of
prisoners, and The Washington Post re-
ported that some C.I.A. prisoners were
being held in Eastern Europe. As the
agency scrambled to move the prison-
ers to new locations, Mr. Rodriguez and
his aides decided to use their own au-
thority to destroy the tapes, officials
said.

One official who has spoken with Mr.
Rodriguez said Mr. Rodriguez and his
aides were concerned about protection
of the C.I.A. officers on the tapes, both
from Al Qaeda, as the C.I.A. has stated,
and from political pressure.

The tapes might visually identify as
many as five or six people present for
each interrogation — interrogators
themselves, whom the agency now pre-
fers to call "debriefers"; doctors or doc-
tor's assistants who monitored the pris-
oner's medical state; and security offi-
cers, the official said. Some traveled
regularly in and out of areas where Al
Qaeda and other Islamist extremists
are active, he said.

Apart from concerns about physical
safety in the event of a leak, the official
said, there was concern for the careers
of officers shown on the tapes. "We
didn't want them to become political
scapegoats," he said.

According to several current and for-
mer officials, lawyers in the agency's
clandestine branch gave Mr. Rodriguez
written guidance that he had the au-
thority to destroy the tapes and that
such a move would not be illegal.

One day in November 2005, Mr. Ro-
driguez sent a cable ordering the de-
struction of the recordings. Soon af-
terward, he notified both Mr. Goss and
Mr. Rizzo, taking full responsibility for

# South Georgia judge faces new misconduct charges

## By RUSS BYNUM
### Associated Press

**SAVANNAH** — A south Georgia judge used his taxpayer-funded secretary to manage an apartment complex and overstepped his bounds by stockpiling hundreds of thousands of dollars in criminal court fees to be released at the judge's whim to Clinch County commissioners, according to new misconduct charges filed Monday.

The Judicial Qualifications Commission, which investigates judicial misconduct in Georgia, added the charges to a case it filed in November against Clinch County Superior Court Judge Brooks E. Blitch III.

The agency previously accused Blitch of ordering illegal payments to county employees and ordering the early release of imprisoned felons. The judge could be removed from office if the commission finds he abused his position. Blitch has denied any wrongdoing.

Though Blitch has not been charged with any crimes, he has been the target of an FBI investigation. Agents searched his office last June in Homerville, near the Georgia-Florida line. A federal prosecutor revealed at a court hearing last month that the FBI had used wiretaps to record the judge's phone conversations.

Charges the state commission filed with the Georgia Supreme Court on Monday say Blitch used his courthouse secretary, Linda Brown Peterson, in the late 1980s to manage an apartment complex owned by the judge and his wife.

became a magistrate judge, with a pay raise for her favorable treatment in a case involving the Blitch's son.

In December 2006, Peterson heard a case in which Brooks Blitch IV accused a man of destroying a piece of logging equipment he owned. Peterson told the man to pay the judge's son $3,200 or she would sign an arrest warrant. He paid the money.

A month later, the commission said, the judge promoted Peterson from part-time to full-time magistrate judge. The appointment included a $14,000 pay raise, "creating the appearance of impropriety between her appointment and her presiding over your son's dispute," the commission said in its court filing.

Blitch has hired the law firm of former Gov. Roy Barnes to defend him, while the judicial commission has hired former state Attorney General Mike Bowers to serve as its prosecutor.

"What the JQC's investigation has shown is that Judge Blitch never personally profited from any alleged impropriety," said John Salter, one of Blitch's attorneys. "Bringing more charges is simply an effort to hype an investigation that has so far contradicted the JQC counsel's rhetoric of a 'pattern of corruption.'"

In its filing Monday, the commission also charged Blitch with keeping tight control over county money that came through the courts to "earner power and influence."

The Judicial Qualifications Commission, which investigates judicial misconduct in Georgia.



IN BRIEF

## Bush continues fight for telecom immunity

**WASHINGTON** — House Democrats came under criticism Saturday from President Bush, who said they are blocking intelligence legislation so lawyers can sue telephone companies for helping the government eavesdrop on suspected terrorists.

Terrorists are plotting attacks "at this very moment," Mr. Bush said in his weekly radio address. He again urged the House to act on Senate-passed legislation needed to renew the intelligence law that expired last weekend.

The Senate bill provides retroactive protection for telecom companies that wiretapped U.S. phone and computer lines at the government's request but without the permission of a secret court that oversees such activities. The House bill lacks such immunity.

The Justice Department and Office of National Intelligence said Saturday that telecom companies are complying with existing surveillance warrants, reversing their declaration from Friday that some help had stopped.

Democrats blamed Republicans for letting the law expire because they and the White House blocked attempts to extend the current law a second time until the two bills could be reconciled.

Rep. John Conyers, the Democratic chairman of the House Judiciary Committee, said current surveillance laws are more than adequate.

*While holy ?? all ???
?? un-Constitutional*

12A · THURSDAY, MARCH 20, 2008 · USA TODAY

## Nation

# Court tosses verdict, death sentence in race-tinged case

### Blacks were cut from jury in La. murder trial

By Joan Biskupic
USA TODAY

WASHINGTON — The Supreme Court on Wednesday threw out the conviction and death sentence of a black man whose prosecutor eliminated all blacks from the jury and invoked the O.J. Simpson case in urging the death penalty.

The 7-2 decision, which gives Allen Snyder a new trial, marks a rare reversal by the justices of a murder conviction, particularly on a claim of racial prejudice during jury selection.

Snyder was tried in 1996 in Jefferson Parish, La., in the killing of his estranged wife's friend. It was less than a year after O.J. Simpson had been acquitted of murdering his ex-wife and her friend. During the sentencing phase of the Snyder



By Mel Evans, AP

**Alito:** Says judge wrongly accepted reasons for removing blacks.

case, prosecutor Jim Williams had referred to the famous California trial. Without naming Simpson at that point, he said the "perpetrator" in that case "got away with it."

Snyder's lawyers cited Williams' Simpson-related remarks as part of their claim that Williams improperly removed jurors based on race.

Justice Samuel Alito, writing for the majority, said Snyder's trial judge wrongly accepted Williams' rationales as he whittled down the jury pool. The court termed the prosecutor's explanation for removing one particular black man "suspicious."

Justices Clarence Thomas and Antonin Scalia dissented.

Stephen Bright of the Atlanta-based Southern Center for Human Rights, who represented Snyder before the justices, said the decision "tells prosecutors that if they discriminate, any conviction they get may be reversed on appeal. And it tells state appellate courts that they must scrutinize the reasons given for strikes and not allow this to go on." The Louisiana Supreme Court had rejected the bias claim.

Jefferson Parish District Attorney Paul Connick said Snyder will be retried. Williams, who is in private practice, said in a telephone interview, "I respect the majority's decision and totally disagree with it. Race had nothing to do with it. The defendant was black. The victims were black. … The jury con-victed based on the evidence. … It had nothing to do with O.J. I'm tired of being vilified on this thing."

A 1986 Supreme Court decision, Batson v. Kentucky, bars prosecutors from using their allotted "peremptory," or discretionary, challenges of prospective jurors to strike someone because of race. The justices have emphasized that the exclusion of minorities undermines the integrity of the system.

Yet racial bias can be difficult to establish. The court has said that judges considering whether there was racial animosity should look at all of the circumstances of a strike.

Williams offered race-neutral explanations as he eliminated blacks. When he struck a college senior — the focus of the Supreme Court ruling — Williams said the student looked "very nervous" and might have wanted a quick resolution because he was in the middle of a student-teaching obligation.

The judge accepted those reasons without making any findings about the juror's demeanor and as Williams spurned concerns voiced by white jurors about the potential time obligations.

"The implausibility of (the) explanation," Alito wrote, "is rein-forced by the prosecutor's acceptance of white jurors who disclosed conflicting obligations that appear to have been at least as serious" as the student's. Alito said nothing in the record offset Williams' apparently discriminatory intentions.

The justice did not mention Williams' Simpson references.

Dissenting, Thomas said the court should have deferred to the judge's acceptance of Williams' explanations. "Given the trial court's expertise in making credibility determinations … it is entirely proper to defer to its judgment," said Thomas, joined by Scalia.

*Exhibit N*

*Exhibit O*

# South Georgia judge faces new misconduct charges

### By Russ Bynum
#### Associated Press

**SAVANNAH** — A south Georgia judge used his taxpayer-funded secretary to manage an apartment complex and overstepped his bounds by stockpiling hundreds of thousands of dollars in criminal court fees to be released at the judge's whim to Clinch County commissioners, according to new misconduct charges filed Monday.

The Judicial Qualifications Commission, which investigates judicial misconduct in Georgia, added the charges to a case it filed in November against Clinch County Superior Court Judge Brooks E. Blitch III.

The agency previously accused Blitch of ordering illegal payments to county employees and ordering the early release of imprisoned felons. The judge could be removed from office if the commission finds he abused his position. Blitch has denied any wrongdoing.

Though Blitch has not been charged with any crimes, he has been the target of an FBI investigation. Agents searched his office last June in Homerville, near the Georgia-Florida line. A federal prosecutor revealed at a court hearing last month that the FBI had used wiretaps to record the judge's phone conversations.

Charges the state commission filed with the Georgia Supreme Court on Monday say Blitch used his courthouse secretary, Linda Brown Peterson, in the late 1980s to manage an apartment complex owned by the judge and his wife.

The commission said Blitch's wife, Peg Blitch, also kept an office in the judge's chambers that she used for personal and political gain. Peg Blitch is a former state senator.

"You used your judicial office, and the resources provided to you by the State of Georgia ... to advance your personal and private interests," the commission said in its document notifying Blitch of the charges.

The commission's filing says Blitch later appears to have rewarded Peterson, after she became a magistrate judge, with a pay raise for her favorable treatment in a case involving the Blitch's son.

In December 2006, Peterson heard a case in which Brooks Blitch IV accused a man of destroying a piece of logging equipment he owned. Peterson told the man to pay the judge's son $3,200 or she would sign an arrest warrant. He paid the money.

A month later, the commission said, the judge promoted Peterson from part-time to full-time magistrate judge. The appointment included a $14,000 pay raise, "creating the appearance of impropriety between her appointment and her presiding over your son's dispute," the commission said in its court filing.

Blitch has hired the law firm of former Gov. Roy Barnes to defend him, while the judicial commission has hired former state Attorney General Mike Bowers to serve as its prosecutor.

"What the JQC's investigation has shown is that Judge Blitch never personally profited from any alleged impropriety," said John Salter, one of Blitch's attorneys. "Bringing more charges is simply an effort to hype an investigation that has so far contradicted the JQC counsel's rhetoric of a 'pattern of corruption.'"

In its filing Monday, the commission also charged Blitch with keeping tight control over county money that came through the courts to "garner power and influence."

Clinch County records show Blitch kept criminal fees collected by the Clinch County courts in an account that the judge controlled. Rather than turning the money over to Clinch County commissioners, who control the county budget, the judge would hand out the funds piecemeal via court order.

The commission listed numerous court orders in which Blitch ordered a total of $690,000 — in individual sums of $12,000 to $64,000 — to be sent to county commissioners between 1993 and 2006.

> The Judicial Qualifications Commission, which investigates judicial misconduct in Georgia, added the charges to a case it filed in November against Clinch County Superior Court Judge Brooks E. Blitch III. The agency previously accused Blitch of ordering illegal payments to county employees and ordering the early release of imprisoned felons.

